UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

RICARDO RODRIGUEZ,

                          Plaintiff,

             - against -

CAROLYN W. COLVIN,[1]
Commissioner of Social Security,

                     Defendant.

———————————————————————————

**REPORT AND
RECOMMENDATION**

12 Civ. 3931 (RJS) (RLE)

To the HONORABLE RICHARD J. SULLIVAN, U.S.D.J.:

## I. INTRODUCTION

Plaintiff Ricardo Rodriguez ("Rodriguez") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability benefits. Rodriguez maintains that the decision of the Administrative Law Judge (the "ALJ") must be overturned because he: (1) failed to properly weigh the medical evidence; and (2) relied on flawed vocational expert testimony. (*See* Mem. of Law in Support of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") at 15, 24.) Rodriguez asks the Court to modify the decision of the Commissioner and grant him maximum monthly insurance and/or Supplemental Security Income ("SSI") benefits, retroactive to the date of the initial disability. In the alternative, he requests that his case be remanded for reconsideration of the evidence. On May 21, 2013, both Parties moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For

---

[1] At the time this case was commenced, the named defendant, Michael J. Astrue, was serving as the Commissioner of Social Security. Since then, Commissioner Astrue has stepped down, and the current Acting Commissioner is Carolyn W. Colvin. Rule 25(d) provides for Colvin's automatic substitution as a party. Fed. R. Civ. P. 25(d).

the reasons that follow, I recommend that the Commissioner's motion be **GRANTED** and the case be **DISMISSED**.

## II. BACKGROUND

### A. Procedural History

Rodriguez applied for Social Security Disability Insurance Benefits on June 4, 2003. (*See* Tr. of Admin. Proceedings ("Tr.") at 36-38.) The application was denied on July 9, 2003, and Rodriguez requested a hearing before an ALJ. (*Id.* at 19, 23.) Rodriguez appeared *pro se* before ALJ George Yatron on June 24, 2005. (*Id.* at 189-98.) Yatron found that Rodriguez was not disabled under the Act. (*Id.* at 10-17.) On October 27, 2005, the ALJ's decision became the Commissioner's final decision when the Social Security Administration Appeals Council ("Appeals Council") denied Rodriguez's request for review. (*Id.* at 3-5.)

Rodriguez filed a civil action in this Court in 2006, and the case was remanded to the Commissioner by stipulation. (*Id.* at 219-20.) On remand, the Appeals Council vacated Yatron's decision, and sent the case back to a different ALJ for further proceedings. (Tr. at 221-24.) A hearing was held before ALJ Paul Heyman ("Heyman") on May 13, 2008, at which Rodriguez was represented by counsel. (*Id.* at 223-24.) Considering the case *de novo*, Heyman found Rodriguez not disabled. (*Id.* at 199-201.)

Rodriguez filed another civil action in this Court in 2010. In his 2010 Report and Recommendation ("2010 R&R"), Magistrate Judge James C. Francis IV found that the ALJ: (1) did not properly set forth his reasoning regarding Rodriguez's impairments; (2) failed to consult a vocational expert; and (3) did not properly explain his reasoning regarding Rodriguez's credibility. (*See id.* at 398.) District Judge George B. Daniels adopted the 2010 R&R in full by an Order dated August 27, 2010, remanding the case to the Commissioner to "allow the ALJ to

2

reconsider the evidence from the treating sources, specify adequate reasons for discounting their opinions if he chooses to do so, reassess [Rodriguez's] credibility, and more fully develop the record as may be needed." (*Id.* at 398-99.) On remand, the Appeals Council noted that Rodriguez had filed a subsequent claim for a period of disability and disability insurance benefits and a new claim for supplemental security income on October 23, 2008. (*See id.* at 400-03.) These claims were merged into the case. (*Id.*)

Per Judge Daniels's Order, a hearing was held before the ALJ on January 19, 2011. (*See* Tr. at 620-67.) ALJ Heyman found that Rodriguez was not disabled. (*See id.* at 337-54.) Rodriguez requested review of Heyman's decision by the Appeals Council on March 31, 2011. (*See id.* at 336.) The Appeals Council denied the request for review. (*See id.* at 236-28.) On May 17, 2012, Rodriguez filed the present action.

## B. The 2011 ALJ Hearing

### 1. Rodriguez's Testimony[2]

At the 2011 hearing, Rodriguez testified that his gout, arthritis, asthma, and depression remained "mostly the same" since his May 13, 2008 hearing. (*Id.* at 630.) In addition, he testified that he now suffers from panic attacks. (*Id.*) He stated that he used to live in an apartment with his wife and four children, but that he and his wife separated two and a half years ago, and he subsequently moved into his parents' home. (*See* Tr. at 79, 626.) Rodriguez stated that he has not worked since 2002, and does not engage in social activities. (*Id.* at 651, 634-35.)

Rodriguez asserted that he had weekly painful flare-ups of gout that affected his knees, feet and elbows, causing him difficulty in sitting, walking, standing, lifting, bending at the waist

---

[2] Rodriguez's testimony regarding his personal history prior to his May 2008 ALJ hearing is set forth in Judge Francis's 2010 R&R. (*See* Tr. at 365-67.)

and at his joints, and using his hands. (*Id.* at 80-84, 86, 87-90, 627, 629, 640, 644-45.) He testified that he has not been hospitalized for any asthma attacks. (*See id.* at 630.) Rodriguez testified that the arthritis in his fingers, hands, elbows and neck have worsened since the 2008 hearing. (*See id.* at 632.) In addition to his continuing depression, Rodriguez also testified that he experienced five to six panic attacks a month. (*See id.* at 638.)

Rodriguez testified to using a walker and cane prescribed by a doctor. (*See* Tr. at 640, 642, 85.) He uses the walker when he experiences gout flare-ups but testified that he did not require assistance in daily living. (*See id.* at 642.) Rodriguez walks two blocks to church every week, but he can only walk a maximum distance of four to five blocks because of "discomfort" in his knees. (*Id.* at 644.) He testified that he continues to avoid taking the subway and the bus because of his knees. (*See id.* at 643.)

### 2. Medical Evidence

Rodriguez has been treated by numerous physicians at Montefiore Medical Group since being hospitalized in September 2002 for gout. (*Id.* at 92-107.) For his physical symptoms, he was under the care of Dr. Stephen Cha (March 2003 – June 2004), Dr. Juliet Widoff (July 2004 – June 2006), Dr. Minesh Shah (July 2006 – December 2009), Dr. Annmarie Bonowitz (January 2010 – April 2010), and Dr. Cedric Edwards (June 2010 – November 2010). (*Id.* at 148-66; 132-47; 178-88; 269-79; 496-501; 573-81; 586-92; 597-602; 489-94; 475-88.) Rodriguez also received consultative examinations from Dr. Mandakini Patel (June 19, 2003), Dr. Sharon Revan (December 8, 2008), and Dr. Herb Meadow (December 8, 2008). (Tr. at 114-18; 359-62; 355-58.) He commenced counseling with licensed social worker Jose Rodriguez (no relation to Ricardo Rodriguez) in May 2007. (*Id.* at 252-55; 280-82; 511-27; 530; 535-52.) For his

4

depression, he came under the care of psychiatrist Dr. Anthony Stern in February 2009. (*Id.* at 464-71; 528-29; 531-34.)

In January 2008, Dr. Shah indicated that Rodriguez had difficulty climbing stairs, walking multiple blocks, or standing for extended periods. (*See id.* at 284.) Occasional flare-ups of gout also limited Rodriguez's ability to lift heavy objects or work with his hands. (*Id.*) Beginning in June 2008, Rodriguez's asthma and gout improved, and he was reportedly going to the gym and had lost six pounds. (*See id.* at 591.) Around this time, Rodriguez met with a nutritionist at Montefiore, and stated that he was exercising regularly. (*See* Tr. at 593, 595.)

Rodriguez continued to see Jose Rodriguez for counseling. Counseling notes from January 23, 2008, reported that Rodriguez had symptoms of "depression, anhedonia[3], sleep disturbance . . . paranoia, irritability, inability to manage his temper and loose boundaries." (*Id.* at 287.) Counseling notes from May 27 show that Rodriguez had been going to the gym "three times a week for at least a month . . . ", and volunteering at a food pantry. (*Id.* at 547, 549.) As of November, counseling notes show that Rodriguez was actively participating in church activities and earning money by helping an elderly woman run errands and taking her to medical appointments. (*Id.* at 539.) In December, Rodriguez told the social worker that he was taking care of his six year-old son. (*Id.*)

On December 8, 2008, Dr. Meadow and Dr. Revan conducted consultative evaluations of Rodriguez. (*See id.* at 355-58.) Dr. Meadow's psychiatric examination results reported that Rodriguez's symptoms appeared to be consistent with his psychiatric problems, but that they did "not appear to be significant enough to interfere with the claimant's ability to function on a daily

---

[3] Anhedonia pertains to the total loss of feeling of pleasure in acts that normally give pleasure. *Dorland's Illustrated Medical Dictionary*, 83 (28th ed. 1994).

basis." (Tr. at 357.)  Furthermore, Dr. Meadow reported that Rodriguez "would be able to perform all tasks necessary for vocational functioning." (*Id.*)  In her physical examination of Rodriguez, Dr. Revan diagnosed him with hypertension, asthma, knee pain, gout, depression, and anxiety.  She noted mild limitations walking distances and climbing stairs, and limitations with prolonged physical activities such as standing. (*See id.* at 362.)  However, Rodriguez had no limitations on his ability to sit. (*See id.*)

Rodriguez met with his nutritionist in January 2009, and reported that he was attempting to exercise and that he walked ten blocks every day. (*See* Tr. at 582.)  In an April 2009 check-up with Dr. Shah, Rodriguez reported no pain and that his gout was "OK overall." (*Id.* at 496.)  In June, Rodriguez told the nutritionist he was "go[ing] to [the] gym," and that he was "trying to cut down on fast food, chips, juices, sodas." (Tr. at 495.)

Dr. Stern, a psychiatrist, began treating Rodriguez in February 2009 for depression and anxiety. (*See id.* at 534.)  In May, Dr. Stern reported that Rodriguez was "less anxious and depressed" since he started taking medication in March. (*Id.* at 528, 532.)  In August, Dr. Stern noted that Rodriguez had persistent depression and that his alcohol abuse had increased, but he noted that Rodriguez was "oddly upbeat," which was "incongruent with reported mood of depression . . . ." (*Id.* at 525.)

Social worker Jose Rodriguez reported that he next saw Rodriguez on December 11, 2009, after a six-month hiatus. (*See id.* at 524.)  During this absence, Rodriguez said that he had "fallen from grace." (*Id.*)  He reported "drinking, smoking, not attending church, neglecting his family and hanging out with 'undesirables.'" (*Id.*)  In a December 28, 2009 follow-up session, Rodriguez reported that he had a panic attack the night before. (Tr. at 523.)

Dr. Annmarie Bonowitz began treating Rodriguez in 2010.  She concluded that Rodriguez was obese at five feet five inches tall and 240 pounds, but that his respiratory examination was normal.  (*See id.* at 493.)  In April, Rodriguez reported knee pain but stated there had been "no new attacks" of gout.  (*Id.* at 490.)  His lungs were clear and there was no knee swelling.  (*See id.*)  Dr. Bonowitz prescribed more medication for Rodriguez's asthma, and assessed depression with substance abuse.  (*Id.*)

Rodriguez was treated by Dr. Cedric Edwards for flare-ups of gout in June and August 2010.  Dr. Edwards's medical notes show that Rodriguez reported eating pork and drinking alcohol "despite knowledge that [sic] causes gout flares."  (*Id.* at 480, 485.)  In October and November, Rodriguez reported no further gout flare-ups.  (*See* Tr. at 476-77.)  He told his nutritionist that he was walking twenty to thirty blocks per day.  (*Id.* at 474.)

In December 2010, Dr. Stern and Jose Rodriguez completed and co-signed a psychiatric questionnaire.  (*See id.* at 564-68.)  They reported that Rodriguez was "mildly limited" in his awareness of normal hazards, ability to take appropriate precautions, and ability to travel to unfamiliar places or use public transportation.  (*Id.* at 467-68.)  They indicated that Rodriguez was "moderately limited" in his ability to remember locations and work procedures, carry out simple one- or two-step instructions, make simple work-related decisions, ask simple questions, or request assistance.  (*Id.*)  In January 2011, Rodriguez told Jose Rodriguez that he was "consistently attending Church."  (*Id.* at 512.)

### 3. Vocational Expert Testimony

After reviewing the record and listening to Rodriguez's testimony, vocational expert Raymond Cestar ("Cestar") testified that Rodriguez could not perform his past relevant work.

(*See* Tr. at 656.)  Cestar testified, however, that Rodriguez could work as an account clerk, order clerk, or clerical worker based on a hypothetical similar person.  (*Id.* at 656-57.)

### 4. The Findings of ALJ Heyman

With respect to physical impairments, Heyman noted that Rodriguez's gouty arthritis "has not manifested in the inability to ambulate effectively or the inability to perform fine and gross movements with the upper extremities effectively." (*Id.* at 343.)  With respect to Rodriguez's asthma, Heyman explained that it "has been essentially asymptomatic since the alleged onset date.  There is no evidence that it has resulted in 6 attacks within any consecutive twelve-month period that have required physician intervention." (*Id.*)

Although Rodriguez testified to very limited daily activities, Heyman noted that the record showed "periods when [Rodriguez] engaged in an array of activities." (*Id.* at 344.)  He pointed to evidence that Rodriguez was actively attending church-related activities.  (*Id.*; *id.* at 521, 538-39.)  Rodriguez was also working out at a gym and "walk[ing] up to thirty blocks five days a week to lose weight." (Tr. at 344.)  Heyman further noted that Rodriguez "spent a great deal of time caring for his young son and had visitation after school or on weekends until the child moved away." (*Id.*)  Additionally, he "ran errands for a woman and took her to medical appointments in exchange for money." (*Id.*)  In light of such evidence, Heyman concluded that there was "only a mild limitation" in Rodriguez's daily living. (*Id.*)

Heyman indicated that Rodriguez had moderate difficulties in social functioning. (*Id.*)  He noted, however, that there was "no indication from any source of record that [Rodriguez] had problems interacting appropriately with others prior to November 2007.  At that time[, Rodriguez's] therapist reported that he had a 'belligerent attitude' and would have serious limitations working with others." (*Id.*)  He further noted that Rodriguez also "behaved

8

obnoxiously and became intimidating, abrasive and annoying in situations when he needed to assert himself or felt agitated." (Tr. at 344.) Heyman observed that Rodriguez's "alcohol abuse appeared to influence the way he conducted himself. His social functioning improved when he limited his alcohol intake and attended church." (*Id.*)

Heyman determined that Rodriguez experienced moderate difficulties with concentration, persistence, and pace. He considered Dr. Shah's finding that Rodriguez's gouty arthritis "only occasionally" interfered with his attention and concentration. (*Id.*) He pointed to mental status examinations by treating and examining sources, which showed Rodriguez's attention and memory skills remained intact. (*Id.*) Heyman found no evidence that Rodriguez experienced "episodes of decompensation[] which have been of extended duration." (*Id.*) Based on Heyman's analysis of Rodriguez's medical evidence, his depressive disorder did not amount to a marked restriction in activities of daily living, social functioning, maintaining concentration, persistence, or pace. (*Id.*)

Heyman found that Rodriguez had the "residual functional capacity to perform sedentary work . . . because [he] can lift and/or carry up to ten pounds occasionally, stand and/or walk up to two hours, and sit up to 6 hours in an eight-hour workday." (Tr. at 345.) Additionally, he found that Rodriguez "is limited to performing simple, repetitive and low stress tasks and may have no more than occasional contact with members of the public." (*Id.*) Heyman arrived at this conclusion by evaluating "objective medical evidence and other evidence" and the findings of each of Rodriguez's treating medical professionals. (*Id.* at 345-48.)

Heyman found that Rodriguez could not perform his past relevant work as a medical records coordinator. However, he considered Rodriguez's "residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines" to

determine if Rodriguez could successfully adjust to other work. (*Id.* at 353.) Because Rodriguez had additional limitations, Heyman consulted vocational expert testimony "[to] determine the extent to which these limitations erode the unskilled sedentary occupational base . . . ." (*Id.*) Based on the testimony of the vocational expert, as well as Rodriguez's age, education, work experience, and residual functional capacity ("RFC"), Heyman issued a finding of "not disabled." (*Id.* at 354.)

## III. DISCUSSION

### A. Standard of Review

A court reviewing a denial of Social Security benefits does not review *de novo* the evidence in the record. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *Jones v Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to determining whether the Commissioner applied the correct legal principles in making a decision and, if so, whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989); *Johnson v. Bowen*, 817 F.2d 983, 985; *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." *Richardson,* 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard applies to findings of fact as well as inferences and conclusions drawn from such facts. *Marrero v. Apfel*, 87 F. Supp. 2d 340, 345 (S.D.N.Y. 2000); *Smith v. Shalala*, 856 F. Supp. 118, 121 (E.D.N.Y. 1994).

If the Commissioner's decision that a claimant is not disabled is supported by substantial evidence in the record, the court must uphold the decision. 42 U.S.C. § 405(g) (2012); *Jones,*

949 F.2d at 59; *Arnone, at* 882 F.2d 34. The court must uphold a denial of benefits supported by substantial evidence even where substantial evidence may also support the plaintiff's position, *Alston v. Sullivan,* 904 F.2d 122, 126 (2d. Cir. 1990), or where a reviewing court's independent conclusion based on the evidence may differ from the Commissioner's. *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied,* 459 U.S. 1212 (1983); *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir. 1982). While the ALJ must set forth the essential considerations with sufficient specificity to enable the reviewing court to determine whether the decision is supported by substantial evidence, he need not "explicitly reconcile every conflicting shred of medical testimony." *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir. 1981)). A reviewing court gives deference to the ALJ's evaluation since he observed the claimant's demeanor and heard the testimony first-hand. *Pena v. Chater,* 968 F. Supp. 930, 938 (S.D.N.Y. 1997), *aff'd sub nom. Pena v. Apfel,* 141 F.3d 1152 (2d Cir. 1998); *Mejias v. Soc. Sec. Admin.,* 445 F. Supp. 741, 744 (S.D.N.Y. 1978).

**B. Determination of Disability**

### 1. Evaluation of Disability Claims

Under the Act, every individual who is considered "disabled" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1) (2012). The Act's definition of disability for the purposes of disability insurance and SSI is substantially the same. *Hankerson v. Harris,* 636 F.2d 893, 895 n.2 (2d Cir. 1980). A person is considered disabled when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir. 1997). Establishing the mere presence of an impairment is not sufficient for a

11

finding of disability; the impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.  42 U.S.C. § 423(d)(2); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).  If a claimant is able to engage in his previous work or other substantial gainful work, regardless of whether such work exists in the immediate area in which he lives, whether a vacancy exists, or whether he would be hired for such work, he will not be found disabled under the Act.  *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  For the individual to be found disabled, both the medical condition and the inability to engage in gainful activity must last for twelve months.  *See Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520 (2012); *Rosa*, 168 F.3d at 77; *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).

The Commissioner must assess the claimant's RFC to apply the fourth and fifth steps of the inquiry.  A claimant's RFC represents the most that claimant can do despite his limitations. 20 C.F.R. § 416.945(a) (2012).  The Commissioner must consider objective medical facts, diagnoses and medical opinions based on such facts, subjective evidence of claimant's symptoms, as well as the claimant's age, education, and work history.  *Echevarria v. Apfel*, 46 F.

12

Supp. 2d 282, 291 (S.D.N.Y. 1999); *Mongeur*, 722 F.2d at 1037 (citing *Miles v. Harris*, 645 F.2d

at 124 (2d Cir. 1981)); 20 C.F.R. § 404.1526(b) (2012).  To properly evaluate a claimant's RFC,

the ALJ must assess the claimant's exertional capabilities, addressing his ability to sit, stand,

walk, lift, carry, push, and pull.  *See* 20 C.F.R. §§ 404.1545(b), 404.1569(a).  The ALJ is also

required to evaluate the claimant's nonexertional limitations, including depression, nervousness,

and anxiety.  *See* 20 C.F.R. §§ 404.1545(b), 404.1569a(c)(1)(I).

      The claimant bears the burden on the first four steps of the evaluation process while the

Commissioner has the burden of proving the fifth step.  *Berry v. Schweiker*, 675 F.2d 464, 467

(2d Cir. 1982).  A claimant's own testimony regarding his daily activities often supports a

finding that the claimant is capable of performing gainful activity.  *See Pena*, 968 F. Supp. at

938.  If the claimant can establish that his severe impairment prevents him from returning to his

previous work, the burden shifts to the Commissioner to demonstrate that the claimant retains

the RFC to perform alternative substantial gainful activity which exists in the national economy.

*Gonzalez*, 61 F. Supp. 2d at 29.  A finding of "not severe" should be made if the medical

evidence establishes only a "slight abnormality" which would have no more than a minimal

effect on an individual's ability to work.  *Rosado v. Astrue*, 713 F. Supp. 2d 347, 358 (S.D.N.Y.

2010).

      Additionally, the claimant's statements regarding pain and other symptoms will be

considered by the Commissioner, but these factors alone will not establish disability.  *See* 20

C.F.R. § 404.1529(a).  Medical findings must support the conclusion that the claimant suffers

from an impairment which could "reasonably be expected to produce the pain or other symptoms

alleged, and which, when considered with all of the other evidence . . . , would lead to a

conclusion that [the individual is] disabled."  20 C.F.R. § 404.1529; *see also* 20 C.F.R. §

13

416.929. If a claimant's symptoms suggest a greater impairment than can be shown by objective evidence alone, other factors should be considered. *Echevarria*, 46 F. Supp. 2d at 292. These factors include: (1) the person's daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and adverse side effects of medication taken by the individual to alleviate pain or symptoms; (5) treatment, other than medication, used to relieve pain; and (6) any other measures that the person uses or has used to relieve the pain or symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ may reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility. *See* SSR 96-7P (S.S.A. July 2, 1996); *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591-92 (2d Cir. 1984). However, the ALJ must give reasons "with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence." *Echevarria*, 46 F. Supp. 2d at 292; *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984); *see Lugo v. Apfel*, 20 F. Supp. 2d 662, 663-64 (S.D.N.Y. 1998).

### 2. The Treating Physician Rule

The Social Security Administration regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The treating physician's medical opinion as to the claimant's disability, even if retrospective, will control if it is well supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gonzalez*, 61 F. Supp. 2d at 29. If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the

14

evidence in support of the physician's opinion; (3) the consistency of the opinion with the record

as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to

the attention of the ALJ that support or contradict the opinion. *See* 20 C.F.R.

§§ 404.1527(c)(2)(i-ii); *Schisler*, 3 F.3d at 567-69. The Commissioner may rely on the opinions

of other physicians, even non-examining ones, but the same factors must be weighed. *See* 20

C.F.R. § 416.927(e). More weight must be given to a treating physician than a non-treating one.

*See id.* §§ 404.1527(c)-(e). Similarly, more weight must be given to an examining source than to

a non-examining source. *See id.* § 416.927(c)-(e).

### 3. The ALJ Properly Reviewed and Considered the Evidence, and Applied the Correct Legal Principles.

Rodriguez asserts that: (1) the ALJ "failed to properly weigh the medical evidence"; and

(2) "relied upon flawed vocational expert testimony." (Pl. Mem. at 15, 24.) The Court finds that

the Commissioner applied the correct legal principles in denying Rodriguez's eligibility, and

properly weighed and reconciled the medical evidence.

#### a. The ALJ Properly Applied the Five-Step Sequential Analysis with Support of Substantial Evidence.

In this case, the ALJ properly employed the five-step sequential analysis as required by

20 C.F.R. §§ 404.1527, 416.920. At the first two steps, the ALJ found that Rodriguez was not

engaged in substantial gainful activity and that he has severe medical impairments – gouty

arthritis, depressive disorder, asthma, morbid obesity, and alcohol dependence. (*See* Tr. at 343.)

Under step three, after reviewing medical evidence, the ALJ determined that Rodriguez's

impairments did not meet or medically equal one of the listed impairments. (*Id.* at 343-44.)

Under step four, the ALJ provided a detailed explanation with supporting evidence why

Rodriguez had the RFC to work. (*See id.* at 345-52.) The ALJ found that Rodriguez's

impairments precluded him from performing his past relevant work as a medical records coordinator after considering a vocational expert's testimony. However, he concluded under step five that "there were jobs that existed in significant numbers in the national economy that [Rodriguez] could have performed." (*See id*. at 353.)

In step three, the ALJ properly evaluated Rodriguez's physical impairments and mental impairments under 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2012). With respect to Rodriguez's physical impairments, the ALJ considered the criteria under Listings 1.00 (gout), 3.03 (asthma), and 14.09 (inflammatory arthritis). (*See id.* at 343.) The ALJ then used medical evidence in the record to support his reasoning that Rodriguez did not meet the requirements of each listing, before concluding that Rodriguez was not physically impaired. (*Id.*)

The ALJ evaluated Rodriguez's mental impairments under paragraph B of Listing 12.04 of 20 C.F.R. Pt. 404, Subpt. P, App. 1. In order to satisfy paragraph B, there must be at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of an extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. In his finding that Rodriguez was not mentally impaired, the ALJ stated his reasoning under each of the four criteria while citing to the record. (*See* Tr. at 343-45.) The ALJ noted, for example, Rodriguez's multiple physical activities that appeared inconsistent with his disability claim. (*See id.*)

Under step four, the ALJ concluded that Rodriguez had the RFC to work by properly analyzing Rodriguez's medical history and the opinions of Rodriguez's treating physicians. (*See id.* at 345-48.) The ALJ properly satisfied the requirement that an ALJ evaluate every medical opinion, as he specifically discussed the objective medical evidence and the medical opinions

16

Case 1:12-cv-03931-RJS-RLE   Document 31   Filed 01/14/14   Page 17 of 20

from each of Rodriguez's primary care physicians dating back to 2003. (*See id.* at 345-48.) While Rodriguez testified that he could only walk a maximum of four to five blocks before experiencing "discomfort" in his knees (*id.* at 644), this was contradicted by medical notes that Rodriguez was able to walk "20 to 30 blocks five days a week." (*Id.* at 474.) The ALJ took this discrepancy between Rodriguez's testimony and the medical record into account, and, as required, explained his reasoning in finding that Rodriguez had the RFC to work. (Tr. at 344.)

Under step five, the ALJ found that Rodriguez did not have the RFC to perform his past relevant work as a medical records coordinator. As required, the ALJ considered Rodriguez's "residual functional capacity, age, education, and work experience in conjunction with Medical-Vocational Guidelines" – as well as a vocational expert – to determine if Rodriguez could successfully adjust to other work. (*Id.* at 353). Because Rodriguez had additional limitations that could not be simply determined under the Vocational Guidelines, the ALJ properly sought the assistance of a vocational expert. (*Id.*) The ALJ subsequently determined that Rodriguez was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. The Court finds that the ALJ's finding of "not disabled" was well supported.

### b. The ALJ Properly Weighed and Reconciled the Medical Evidence, and Thus Did Not Rely on Flawed Expert Testimony.

Rodriguez argues that the ALJ did not give proper weight to the treating opinions of Dr. Stern, social worker Jose Rodriguez, and Dr. Meadow. (*See* Pl. Mem. at 16-20.) The record, however, shows that the ALJ explained his reasoning regarding each of these providers. For example, the ALJ gave "little weight" to Jose Rodriguez's assessment because the social worker indicated that Rodriguez might be a malingerer, which "demonstrates that [Jose Rodriguez] had

17

reservations regarding [Rodriguez's] credibility and casts significant doubt on the accuracy of the purported limitations." (Tr. at 351.)  Second, the ALJ noted that "Jose Rodriguez's opinion is not entirely supported by the claimant's psychiatric progress notes," as "treatment records show that [Rodriguez] was more functional when he attended church and took his medication, and that he engaged in many activities during these periods." (*Id.*)  The ALJ considered the treatment notes as a whole, and indicated that "[Rodriguez's] limitations were more attributable to his alcohol dependence and irascible character, rather than depression." (*Id.*)

Similarly, the ALJ gave "limited weight" to Dr. Stern's assessment of Rodriguez because "[a]lthough Dr. Stern indicated that [Rodriguez] was not a malingerer, this is not consistent with the assessment of [social worker Jose Rodriguez]." (*Id.*)  Furthermore, the ALJ noted that Rodriguez's "limitations reported by Dr. Stern [were] not supported by the psychiatric progress notes, which failed to disclose significant mental status examination findings." (*Id.*)

The ALJ also gave "limited weight" to Dr. Meadow's consultative examination of Rodriguez because "[Dr. Meadow's] opinion [was] not entirely consistent with [Rodriguez's] psychiatric progress notes or the treating source opinions . . . .  However, his findings and opinion do support the conclusion that [Rodriguez], ultimately, is not disabled." (*Id.*)

This Court finds that the ALJ properly reconciled the differences and sufficiently explained his weighing of different treating source opinions.

Rodriguez argues that the ALJ did not properly reconcile Dr. Shah's more restrictive assessment that he could not consistently work because of gout with Dr. Widoff's less restrictive assessment.  The ALJ, however, need not "explicitly reconcile every conflicting shred of medical testimony." *Mongeur*, 722 F.2d at 1040; *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).  In addition, the treating physician's medical opinion on Rodriguez's disability,

18

even if retrospective, will control if it is well-supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gonzalez*, 61 F. Supp. 2d at 29. There was no error in the ALJ's decision to give "significant" weight to treating physicians Dr. Widoff and Dr. Shah, each of whom treated Rodriguez in succession for a combined five-year period. The ALJ explained that Dr. Widoff's and Dr. Shah's assessments were generally "consistent with the record as a whole, including one another."[4]  (Tr. at 348.)

Rodriguez also argues that the ALJ failed to assign any weight to Dr. Patel's consultative orthopedic evaluation. (Pl. Mem. at 23.) The record shows, however, that the ALJ did take into consideration the results of Dr. Patel's examination, which the ALJ found to "further support[] the finding that the claimant can perform sedentary work activities." (Tr. at 346.) This satisfies 20 C.F.R. § 404.1527(b) and § 416.927(b). Claimant's argument is thus untenable.

Finally, Rodriguez argues that, because the vocational expert's testimony was "not grounded in substantial evidence in the record . . . [it] was insufficient to meet the Commissioner's burden of proof at step five that there is alternative work [Rodriguez] can perform." (Pl. Mem. at 24.) However, because this Court found that ALJ Heyman properly applied the five-step analysis based on substantial evidence, the vocational expert's testimony based on the ALJ's finding is therefore well-grounded and without flaw. Accordingly, the ALJ's

---

[4] Dr. Widoff, who treated Rodriguez mainly for gout in his knees and elbows from July 2004 until June 2006, did not believe that Rodriguez was disabled from a medical standpoint. (Tr. at 188.) Dr. Widoff opined that Rodriguez could sit for an entire eight-hour workday with breaks, walk three to five blocks without stopping, lift up to ten pounds, and perform fine manipulation with his hands. (*Id.* at 183.) Dr. Shah, who took over Dr. Widoff's care of Rodriguez in July 2006, generally agreed with Dr. Widoff regarding these assessments, and he specifically opined that Plaintiff could stand and/or walk up to two hours of an eight-hour workday. (*Id.* at 249-50.)

19

decision that Rodriguez is not eligible for SSI benefits was determined under the correct legal standard and supported by substantial evidence.

## IV. CONCLUSION

For the reasons set forth above, I recommend that Defendant's motion be **GRANTED**, and that the Complaint be **DISMISSED**.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, 40 Foley Square, Room 2104, and to the chambers of the undersigned, 500 Pearl Street, Room 1970.  Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals.  *See Thomas v. Arn*, 474 U.S. 140, 149-150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1)(c) (West Supp. 1995); Fed. R. Civ. P. 72(a), 6(a), 6(d).

**DATED**: **January 13, 2014**
**New York, New York**

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge

Copies of this Report and Recommendation were sent via ECF to counsel for all parties.